## Inland Steel Co. v. Edward P. Eastman, Adm'r.

1.  HAZARDS OF EMPLOYMENT—*A Question of Law.*—When the facts are conceded, or there is no dispute as to such facts, and they show that the hazard was ordinarily incident to the employment, and not in any way imputable to lack of ordinary care on the part of the employer, then the question of hazard becomes one of law, and there is nothing for the jury to determine.

2.  SAME—*Directing the Verdict Where the Risk is Incident to the Employment.*—Where reasonable minds must agree in concluding that the risk was incident to the employment, and not to be imputed to any fault of the appellant, a verdict should be directed for the defendant.

**Trespass on the Case.**—Death from negligent act.  Trial in the Circuit Court of Cook County; the Hon. JOHN GIBBONS, Judge, presiding. Verdict and judgment for plaintiff.  Appeal by defendant.  Heard in this court at the March term, 1898.  Reversed.  Opinion filed January 26, 1899.

This suit was brought to recover damages for the death of appellee's intestate, which it is claimed was caused by negligence of appellant.  The deceased was an employe of appellant in its rolling mills, where he received the injury which caused his death.  His duties were to help in the running of hot steel rails through the rolls.  It is claimed that the direct cause of the injury was the deflecting of a hot rail, which, instead of coming straight out from the rolls, bent and curved upward, and thus came in contact with the body of deceased.  The first count filed, which alleged defective and unsafe condition of the press, seems to have been abandoned upon demurrer.  The issues were formed and the cause tried upon the allegations of two additional counts.  The first alleges negligence in running a steel rail through the rolls when the rail was not sufficiently heated to be safely run through, and that thereby the rail " curled up in the air and diverted from the course it would have followed had it been sufficiently hot," whereby the intestate was injured, etc.  The second alleges two distinct charges of negligence, viz., negligence in failing to furnish a reasonably safe place to work, and that appellant

" employed so many men huddled together in a small space, and carelessly and negligently permitted a certain rail or bar, which was not in proper condition, to go through the rolls in the direction of intestate, said rail or bar curling up in the air," whereby, etc., intestate was injured. The trial resulted in verdict and judgment for appellee.

JOHN A. POST and O. W. DYNES, attorneys for appellant.

MUNSON T. CASE, attorney for appellee.

MR. JUSTICE SEARS delivered the opinion of the court.

This appeal is disposed of upon a consideration of one question only, viz., the right of appellee to a recovery upon all the facts disclosed. No evidence was presented to sustain one allegation of negligence, contained in the second of the additional counts, viz., the charge that appellant was negligent in not providing sufficient space in which safely to work. The only evidence presented upon this point conclusively negatived any fault in this regard. Ladona, a witness for appellee, testified that " there was lots of room on the north; did not measure it, but it was large enough," and that the space to the south was " about ten feet wide and over fifty feet long." In answer to a question by the court as to the number of men who were working around that particular roll, this witness answered " two."

Zone, also a witness for appellee, testified : " There were working there before he got hurt two persons; three persons were working two rolls; at the time Miniscalo was hurt there were six persons working." Drumgoole, on behalf of appellant, testified that the space was unobstructed thirty or forty feet in front of the rolls. Brooke testified that there was a free space of forty or forty-five feet in front of the rolls. From this, the only evidence in this regard, no question is raised as to the sufficiency of the space in which the intestate worked.

There remains, then, to be considered, only the allegations of negligence in permitting a rail to be put through

the rolls, when it was of improper temperature, as alleged in the first additional count, or in improper condition, as charged in one of the allegations of the second additional count.

Two questions are presented upon the evidence, first, whether there is any evidence which would warrant a jury in finding that the deflecting of the rail was caused by any particular one of the many conditions which it appears from the evidence might have caused it; and, secondly, whether the occurrence, *i. e.*, the deflecting of the rail, was such an incident to the work for which the deceased was employed as to be conclusively an assumed hazard.

The evidence shows, without contradiction, that the deflecting of the rails from a straight course in their exit from the rolls, might be caused by any one of a number of conditions. Clark, an expert of twenty-one years' experience, called as a witness for appellee, was asked a hypothetical question ending as follows:

" What, in your judgment as a roller hand (of the experience you have testified to) is the cause of that bar or rail turning up in that way ?  A.  I will be frank with you and say that they are too numerous to mention each one. I do not know that I could give them all, but I will name some of the important ones, however.  A steel sliver on·the point of the guide near one of the rails, might strike it; that is one cause; the point of the guide being broken would be another cause; the piece being chilled on the top side would be another, or coming in contact with any obstruction in the way of the pass after leaving the roll, that would be another; the roll being too slack, the top one; the set screw at the end being slack, that would be another.  In mill parlance we call it ' back lash.' "

" Q.  Let us see; I don't know whether you have stated whether or not the temperature, the degree of heat— A.  Oh, yes; let's see; yes, that would be an important cause; if it was chilled near the end of the piece.  That would be another one, provided the top was a little cold at that time; it would have a tendency to run up after it got out to a certain length, but being any longer it would naturally drop down."

Mathias, superintendent of another rolling mill, and an

expert of forty years' experience, called by appellant, testified as follows:

"Q.  If you were told that this condition, as I have given it in the second preceding question, a piece of steel of the dimensions there given came out and diverged upward, would you be able to say from your experience as you have given it, what was the cause of the divergence?  A.  There are several causes that will cause the bar to go up.

"Q.  Would you be able to say which particular one of the several might be acting upon it?  A.  The bar starting into the rolls may blur the point of the guide and cause the bar to start up.  The bar preceding the one that was being rolled may have tipped the point of the guide up a little by lever.  I have known causes of that kind.   *   * A piece left on the guide from the bar preceding will often do it.

"Q.  Might not the condition of the heating have something to do with it?  A.  Not in a bar of that size."

Job, an expert witness, of forty years' experience, called by appellant, testified:

"Q.  In your experience, or from your experience, are you able to state what number of causes might give rise to such deflection?  A.  Oh, yes, there are a great many causes; one of the common causes is the liability of a sliver from the end breaking off.  All ends of rails work down in that way, and unless the ends are cut square off, these ends will become ragged and a small sliver is liable to get under the guide or guide plate, and immediately that occurs it throws the steel over, either up or sideways and in different directions.  Where these slivers get under the guide, that is a very common occurrence.

"Q.  Are there other causes?  A.  Yes, there are other causes.

"Q.  A multitude of them?  A.  A great many causes.

"Q.  Now, is it not a fact that there is a multitude of other causes, taken in the course of time, which contribute to affecting the deflections more frequently than the condition of the heating contributes to the deflection?  A. Yes, sir.

"Q.  And if it were true that a piece of steel had passed back and forth several times in the process of its reduction through the machine and it never deflected or curled or crooked until it was put to this last pass, would that indicate to your mind that it was deflected probably from some

Inland Steel Co. v. Eastman.

other cause than the heating? A. Yes; it would not be possible from the heating; that shows itself in the early reduction."

Drumgoole, the heater, with whom appellee's intestate was working as a helper when injured, testified that each piece of rail is put through the rolls several times in process of reduction, and that, although not sure, he thought the bar was going through the fourth time when the accident occurred. He testified further:

"Q. If a deflection occurs by reason of improper heating, in which one of these passes will it manifest itself, if you know? A. Well, the first; the first generally; if there is any flaw in the heat, the first pass will show it."

Brooke, one of the workers on the rolls, called by appellant, testified that when the accident occurred the rail was upon "about the fourth pass through the rolls," and further:

"Q. Now, supposing that the divergence in a bar passing through is due to heat, in which course—that is, we will say the bar is improperly heated—in which of the courses through, going back and forth, the earlier or the later ones, will the defect manifest itself, if you know? A. Only with the first pass."

He also testified that there were a number of causes which might result in the deflection of the rail.

The only evidence upon which a finding could be based that it was unevenness of temperature which caused the deflection, is to be found in the testimony of Ladona and Zone, who were employed in the same work with the deceased. Each of them testified that the rail was " a little cold " and " rather cold."

It is difficult to perceive from the evidence what means of knowledge Ladona possessed as to the temperature of this piece of steel when it came from the rolls. It does not appear that he saw it or had any occasion or opportunity to judge of its temperature at any time after it came from the furnace.

Zone gave no testimony which would warrant a belief that he was informed as to conditions which caused the rail

to curl upward. His statement that it was "rather cold" is given without ground or reason therefor. At the time of the accident he was about seventeen years of age. Neither Ladona nor Zone could be regarded as an expert.

In this condition of the evidence, we think that a finding by the jury to the effect that the deflection of the rail was caused by an unevenness of its temperature as alleged in the declaration, is clearly against the weight of the evidence.

But the decision of the second question, viz., whether the occurrence which resulted in the death of the intestate was an ordinary hazard incident to the employment, is determinative of the cause. Upon this question there is no conflict in the evidence. All witnesses agree that it was a matter of common occurrence for rails to thus deviate from a straight course in coming from the rolls.

Ladona testified that the rails "some days went up, but that is a few days; a few days they went up, they went wrong, and the other days they always went their own way straight."

"Q. You say some days those rails came out of the rolls straight and fell down on the floor, and sometimes came out every which way? A. Yes, sir.

"Q. Did it do that lots of times? A. It didn't always do that.

"Q. But you saw them do that lots of times? A. Yes, sir, it did it many times, but not every day."

Zone was not questioned in this behalf.

Clark, the expert called by appellee, testified:

"Q. In the best regulated machine shops, that fact is not always obviated? A. Oh no, that will occur."

Mathias testified:

"Q. Presuming that the rolls are in reasonably good condition and everything is reasonably well managed, as in the most modern and best conducted concerns of that kind, is or is not that still a common occurrence? A. Yes, sir.

"Q. Can you state from your own knowledge and experience, whether or not these divergencies of the outcoming bars, from rolls such as the ones in question that we have referred to, is one of the common facts incidental to the operation of such rolling machines on such steel bars? A. most assuredly.

" Q.   I will ask you this question, Mr. Mathias : is it reasonably possible to eradicate from these machines all the conditions that will cause such deflections as you have described and testified about in your earlier answers ?   A. No, sir."

Job testified that it was a " very common occurrence in rolling steel;" that it might not occur for days; that it " might occur three or four times in a half hour; " that it would depend upon the character of the material; etc.

Drumgoole testified :

" Q.   When these steel rails that are reduced leave the rolls, what course do they usually take—what direction ?   A. Well, they vary; sometimes they will go one way, and sometimes the other; that is the way it is—you can not tell exactly what way they will go.

" Q.   Is it a matter of frequent occurrence for the rails to turn up as they leave the rolls ?   A.   Yes, sir.

" Q.   How frequent ?   A.   You can not tell when it will; sometimes they turn up and sometimes they turn down, and sometimes they go on one side or the other.   The least little bit of a scale in the rolls will give them a twist to one side or the other.

" Q.   And how much do they turn ?   A.   One piece might come out straight, and the next piece will be one-sided, and the next piece might turn up.

" Q.   Curl clear up ?   A.   Yes, sir; you can't tell anything about it."

Brooke testified that such divergence of the rails was of common occurrence, and further :

" Q.   State whether or not you know of any practicable way that will prevent this divergence and make them all go in a straight line ?   A.   I do not."

There is no evidence whatever to warrant a finding that the task of inspecting the rails as to temperature devolved upon any one other than Drumgoole and Brooke, each of whom worked with the deceased and neither of whom sustained any relation of vice-principal or foreman; nor is there any evidence of a lack of capacity on the part of either of them, or a lack of proper inspection at the time in question.

This evidence as to the nature of the accident which caused the injury is not contradicted.   It is undisputed that the

deflection of a rail, which, it is charged, was the proximate cause of the death of the intestate, was a matter of very frequent occurrence in like work.

The doctrine contended for by counsel for appellant, viz., that an employe does not assume all the risks incident to his employment, but only such as are usual, ordinary and remain so incident after the master has taken reasonable care to prevent or remove them, or, if extraordinary, such as are so obvious and expose him to danger so imminent that an ordinarily prudent and careful man would anticipate injury as so probable that in view of it he would not enter upon or remain in the employment, is undoubtedly the law. But what of its application here? Here it appears not only that the deflection of the rails, in their exit from the rolls, sometimes resulting from unevenness of temperature and sometimes from other causes, was an incident of very frequent occurrence in the work, but it appears as well, and without contradiction, that the hazard of such occurrences can not be avoided by the exercise of ordinary and reasonable caution.

The line of decisions cited by counsel to sustain the proposition that the doctrine of assumed hazard should not be made a cloak to shield the employer from consequences of his own negligence can not govern here, because they do not apply to the facts here established.

Nor can any question arise here as to the application of the rule that the servant does not necessarily assume the hazard resulting from defects of which he knows, unless he also knows, or should know, the danger involved in such defects. The difficulty of applying either of these rules arises from the fact that the evidence here shows no negligence; i. e., that it appears, without contradiction, that the incident from which the peril arose was one which was not avoided by such care as is exercised by those who prudently conduct like works in the most modern and best regulated machine shops. In other words, it was a peril incident to the work and not avoidable by the exercise of such ordinary and reasonable care as the law requires of the em-

ployer. It did not arise from any lack in the discharge by the master of his personal duty. Nor was it proper that the jury should have been permitted to determine otherwise. Ordinarily the question of whether a particular hazard is or is not an assumed risk is a question for the jury; but not if the evidence is undisputed that it was, and if there be no evidence whatever to warrant a jury in finding that it was not.

When the facts are conceded, or where there is no dispute whatever as to the facts, and they show beyond question that the hazard was ordinarily incident to the employment and not in any way imputable to lack of ordinary care on the part of the employer, then the question may become one of law. Wabash Ry. Co. v. Brown, 152 Ill. 484; C. & E. I. R. R. Co. v. Driscoll, 176 Ill. 330.

Reasonable minds could not differ, but must agree in concluding that the risk here was incident to the employment, and not to be imputed to any fault of the appellant. Hence a verdict should have been directed for the defendant, appellant here.

The judgment is reversed.